UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AIDEN MACMILLAN,<br><br>               Plaintiff,<br><br>-against-<br><br>IDEANOMICS, INC., SHANE MCMAHON, ALFRED POOR, JAMES S. CASSANO, HARRY EDELSON and JIAN REN FAN,<br><br>               Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Aiden MacMillan ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against Ideanomics, Inc. ("Ideanomics" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Ideanomics, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition of VIA Motors International, Inc. ("VIA") by Ideanomics (the "Proposed Merger").

2. On August 30, 2021, Ideanomics and VIA entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Ideanomics would acquire VIA for $450,000,000 worth of Ideanomics common shares upon closing, and an additional $180,000,000 worth of Ideanomics common stock payable before December 31, 2026, subject to fulfillment of

1

certain conditions ("Merger Consideration").

3. On November 5, 2021, in order to convince Ideanomics shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading proxy statement on Form S-4 (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Ideanomics and VIA; and (ii) the valuation analyses performed by the Company's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley") in support of its fairness opinion.

5. The special meeting of the Company's shareholders to vote on the Proposed Merger is scheduled for December 22, 2021 ("Shareholder Vote"). Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so Plaintiff can cast an informed vote and properly exercise his corporate suffrage rights.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger until the material information discussed herein is disclosed to Ideanomics' shareholders sufficiently in advance of the Shareholder Vote or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Sec. Inv'r Prot. Corp.* 764 F.2d at 1316.

9. Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Ideanomics' common stock trades on the Nasdaq, which is headquartered in this District. Further, Ideanomics hired Morgan Stanley as a financial advisor which is located in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases). Moreover, the combined company's common stock will continue to trade on the Nasdaq, further rendering venue in this District appropriate.

## PARTIES

10. Plaintiff is, and at all relevant times has been, a holder of Ideanomics common stock.

11. Defendant Ideanomics is a Nevada corporation, with its principal executive offices located at 1441 Broadway, Suite 5116, New York, NY 10018. Ideanomics' common stock trades on the Nasdaq under the ticker symbol "IDEX".

12. Individual Defendant Shane McMahon is, and has been at all relevant times, a director of Ideanomics.

13. Individual Defendant Alfred Poor is, and has been at all relevant times, Chief Executive Officer and a director of Ideanomics.

14. Individual Defendant James C. Cassano is, and has been at all relevant times, a director of Ideanomics.

15. Individual Defendant Harry Edelson is, and has been at all relevant times, a director of Ideanomics.

16. Individual Defendant Jian Ren Fan is, and has been at all relevant times, a director of Ideanomics.

17. The Individual Defendants referred to in ¶¶ 12-16 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with Ideanomics, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

I. **Background and the Proposed Merger**

18. Ideanomics was incorporated in the State of Nevada on October 19, 2004. Through September 30, 2021, Ideanomics has operated in one segment with two business units, Ideanomics Mobility and Ideanomics Capital. Together, they are driving electric vehicle adoption across multiple vehicle markets globally by offering integrated services with regard to vehicles, charging, energy, information and management services and financing.

19. VIA is a Delaware corporation that was incorporated in 2014. VIA was initially incorporated as VIA Motors, Inc. as a Delaware corporation in 2010. VIA is an electric commercial vehicle company focused on electric drive technology and delivering sustainable mobility

solutions. VIA designs, manufactures and markets electric commercial vehicles, for use across a broad cross-section of the global fleet customer base. VIA's initial operations were based on designing, producing, and marketing hybrid vehicles, of which about 200 vehicles were sold until 2016. VIA discontinued the hybrid vehicles product line due to its plans to focus exclusively on fully electric vehicles.

20. On August 30, 2021, the Company issued a joint press release announcing the Proposed Merger, which states in relevant part:

### Ideanomics in Transformative Deal, to Acquire VIA Motors Valued at Up to $630MM

NEW YORK and OREM, Utah, Aug. 30, 2021 /PRNewswire/ -- Ideanomics (NASDAQ: IDEX) ("Ideanomics" or the "Company"), a global company focused on driving the adoption of commercial electric vehicles and associated energy consumption, today announced it has entered into an agreement to acquire VIA Motors International, Inc. ("VIA") in an all-stock transaction for a 100-percent ownership stake, subject to customary closing conditions, including Ideanomics' shareholder approval.

VIA Motors, headquartered in Orem, Utah, will manufacture electric commercial vehicles including Class 2 through Class 5 cargo vans, trucks, and buses. The company has deep experience in the vehicle electrification market and continues to develop business relationships with commercial fleets and distributors in the United States, Canada, and Mexico. VIA Motors is also working with an autonomous technology company to provide electrification of autonomous trucks for short-haul and mid-mile delivery.

VIA utilizes a scalable and flexible electric skateboard platform for Class 2, 3, 4 and 5 vans and trucks, along with a modular body approach that enables a capital-light single design for its platforms, drive systems and vehicle models. VIA's intellectual property portfolio extends to proprietary software and control systems featuring embedded diagnostics and telematics to significantly improve fleet operating costs, uptime, and routing for superior life cycle economics.

"This is a transformative deal for Ideanomics," said Shane McMahon, Executive Chairman of Ideanomics. "As we continue to grow into a leader in the commercial EV space VIA Motors adds valuable brand cachet and an exceptional manufacturing discipline to our portfolio. Bob's proven executive leadership has helped establish VIA as a market disruptor and we are excited to welcome him and his team to the Ideanomics family."

"This acquisition is aligned with our long-term strategy and provides us an immediate leadership position in a rapidly growing market and yet another path to accelerate EV adoption and Ideanomics' market share. said Ideanomics Chief Executive Officer Alf Poor. "It also provides Ideanomics a full OEM manufacturing capability which are synergistic to our other operating businesses."

"VIA Motors is changing last and mid-mile delivery with innovative electric commercial vehicles that fleets can afford," said Bob Purcell, CEO of VIA Motors. "Combining VIA with Ideanomics facilitates significant synergies, while Ideanomics' financial and personnel resources provide the backing we need to pursue an array of exciting growth prospects we have identified. All of us at VIA Motors are delighted to join the team to usher in the new era of electric commercial vehicles and further the long-term growth strategy at Ideanomics."

Transaction Details

The agreement values VIA at $450 million. Under the terms of the agreement, after the application of certain purchase price adjustments, VIA shareholders will receive approximately 162 million shares of Ideanomics common stock based on the 30-day VWAP of Ideanomics' common stock of $2.34 as of August 27, 2021. VIA shareholders are expected to own approximately 25% of the combined company, excluding the potential earnout payment. Ideanomics is separately advancing $50 million of financing to VIA in the form of a secured convertible note issued by VIA to fund its growth, which will be subject to the purchase price adjustment described above.

VIA shareholders are eligible for potential earnout consideration of up to $180 million. The earnout is contingent upon pre-established vehicle delivery volume thresholds through 2026. Earnout consideration will be paid in Ideanomics stock.

The transaction is subject to regulatory approval, Ideanomics shareholder approval, and other customary closing conditions and is expected to close immediately following the Ideanomics shareholders' meeting. The agreement has unanimous support from the Ideanomics Board of Directors. Following the closing of the transaction, VIA Motors will operate as a distinct business unit reporting to Alf Poor, Ideanomics CEO and the Ideanomics Board of Directors.

Advisors

Morgan Stanley & Co. LLC acted as exclusive financial advisor to Ideanomics, with Venable LLP acting as Ideanomics' legal advisor, Han Santos LLP acting as intellectual property counsel, UHY Advisors acting as accounting and taxation advisor, and BJ Arnold acting as business consultant. Blue Sea Advisors acted as industry consultants to VIA, with Evercore acting as financial advisor, and White and Case, LLP as legal advisors.

***

**II.    The Proxy Omits Material Information**

21.     On November 5, 2021, Defendants filed the materially incomplete and misleading Proxy with the SEC.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

        A.    <u>The Misleading Incomplete Financial Projections</u>

22.     The Proxy fails to provide material information concerning financial projections of the Company and VIA relied upon by the Board in recommending the Proposed Merger, and by Morgan Stanley in performing its financial analyses to issue its fairness opinion. Proxy at 76 & 84. The Proxy states that in connection with evaluating a possible transaction with VIA, Ideanomics' management provided: (i) standalone forecasts for Ideanomics based on Ideanomics' management long-range projections through 2026 and extrapolations through 2036 – the "Ideanomics Management Case" and (ii) standalone forecasts for VIA based on Ideanomics' management long-range projections through 2026 and extrapolations through 2036 – the "VIA Base Case". Proxy at 81. However, the Ideanomics Management Case and VIA Base Case projections disclosed in the Proxy are materially misleading.

23.     With respect to the Ideanomics Management Case projections, the Proxy fails to disclose: (i) the line items underlying Adjusted EBITDA, EBIT and Unlevered Free Cash Flow; and (ii) a reconciliation of all non-GAAP to GAAP metrics. Proxy at 82.

24.     Likewise, with respect to the VIA Base Case projections, the Proxy fails to

7

disclose: (i) the line items underlying Adjusted EBITDA, EBIT and Unlevered Free Cash Flow; and (ii) a reconciliation of all non-GAAP to GAAP metrics. Proxy at 83.

25. The omission of this information renders the financial projections disclosed by Defendants a mis-leading half-truth and thereby a direct violation of Regulation G and consequently Section 14(a).

26. When a company discloses non-GAAP financial measures in a Proxy that were relied on by a board of directors to recommend that stockholders exercise their corporate voting rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation, whether by a schedule or other understandable method, of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

27. Courts have recognized that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

28. For this reason, when a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v.*

8

*Transgenomic, Inc.*, 916 F.3d 1121, 1124-1125 (8th Cir. 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).

29. Accordingly, Defendants have disclosed some of the information related to the projections relied upon by Morgan Stanley, but have omitted crucial line items and reconciliations. Thus, Defendants' omission renders the projections disclosed on pages 82 and 83 of the Proxy misleading.

B. The Misleadingly Incomplete Summary of Morgan Stanley's Fairness Opinion

30. The Proxy describes Morgan Stanley's fairness opinion and the various valuation analyses performed in support of its opinion. Defendants concede the materiality of this information in citing Morgan Stanley's fairness opinion and the valuation analyses among the "material" factors the Board considered in making its recommendation to Ideanomics shareholders. Proxy at 76. However, the summary of Morgan Stanley's fairness opinion and analyses provided in the Proxy fails to include, *inter alia*, key inputs and assumptions underlying the analyses. Without this information, as described below, Ideanomics shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Merger. This omitted information, if disclosed, would significantly alter the total mix of information available to Ideanomics shareholders.

31. With respect to Morgan Stanley's *Discounted Cash Flow Analysis* for VIA, the Proxy fails to disclose: (i) the inputs and assumptions underlying the discount rates range of 11.6% to 13.6%; (ii) the inputs and assumptions underlying the perpetuity growth rates range of 2.5% to 3.5% applied in the analysis; (iii) the terminal values; and (iv) VIA's weighted average cost of capital utilized in the analysis. Proxy at 87-88.

32. With respect to Morgan Stanley's *Discounted Cash Flow Analysis* for Ideanomics, the Proxy fails to disclose: (i) the inputs and assumptions underlying the discount rates range of 11.5% to 13.5%; (ii) the inputs and assumptions underlying the perpetuity growth rates range of 2.5% to 3.5% applied in the analysis; (iii) the terminal values; and (iv) Ideanomics' weighted average cost of capital utilized in the analysis. Proxy at 89-90.

33. These key inputs are material to Ideanomics shareholders, and their omission renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles explaining the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions: in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Discounted cash flow analyses grant wide discretion to the banker to choose outcome-determinative metrics such as "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explained regarding discounted cash flow analyses:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

34. In other words, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Without such undisclosed information, Ideanomics shareholders cannot evaluate for themselves whether the financial analyses performed by Morgan Stanley were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Merger. Full disclosure of the omissions identified above is required in order to ensure that shareholders can fully evaluate the extent to which Morgan Stanley's fairness opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Merger.

35. Without the above-omitted information, Ideanomics shareholders are misled as to the reasonableness or reliability of Morgan Stanley's analysis, and are unable to properly assess the fairness of the Proposed Merger. As such, these material omissions render the summary of the *Discounted Cash Flow Analysis* for Ideanomics and VIA included in the Proxy misleadingly incomplete.

36. With respect to Morgan Stanley's *Selected Publicly Traded Companies Analysis* for VIA, the Proxy fails to disclose: (i) the individual metrics observed for the companies selected as comparable to VIA; (ii) the inputs and assumptions underlying the AV/2024E Revenue reference range of 0.6x – 1.0x; (iii) the inputs and assumptions underlying the AV/2025E Revenue reference range of 0.4x – 0.6x; and (iv) the equity values for each company. Proxy at 86-87.

37. With respect to Morgan Stanley's *Selected Publicly Traded Companies Analysis* for Ideanomics, the Proxy fails to disclose: (i) the individual metrics observed for the companies selected as comparable to Ideanomics; (ii) the inputs and assumptions underlying the AV/2024E

11

Revenue reference range of 0.7x – 1.2x; (iii) the inputs and assumptions underlying the AV/2025E Revenue reference range of 0.5x – 0.9x; and (iv) the equity values for each company. Proxy at 88-89.

38. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming Shareholder Vote, Plaintiff will be unable to cast an informed vote on the Proposed Merger and is threatened with irreparable harm warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act**

39. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

41. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading." 17 C.F.R. § 240.14a-9.

42. The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

43. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding: (i) financial projections for Ideanomics and VIA; and (ii) the valuation analyses performed by Morgan Stanley.

44. In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders, although they could have done so without extraordinary effort.

45. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that Morgan Stanley reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by Morgan Stanley, as well as their fairness opinion and the assumptions made, and matters considered in connection therewith. Further, the Individual Defendants were privy to

and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Morgan Stanley's analyses in connection with their receipt of the fairness opinion, question Morgan Stanley as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

47. Ideanomics is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

48. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff

be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

49. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50. The Individual Defendants acted as controlling persons of Ideanomics within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

51. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were

thus directly involved in preparing this document.

53. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

56. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result

of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 2, 2021

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*